United States v. Ms. Gonzalez and three other defendant appellants. Mr. Clue, on behalf, you're here for all appellants? Have I got that right? Yes, Your Honor. That's good. Thank you. You may proceed. Thank you, Your Honor. The issues that we would like to focus on are the role enhancement and the loss calculation for these four defendants. These were considered a family, although only three of these defendants were actually members of the family. And the problem that we have argued in our briefs is that the government treated this group of women essentially as a group and had largely undifferentiated conclusory allegations. Let me tell you the first big problem you have in this case, the way I see it. Three out of the four issues that you've raised on appeal, including the two that you're arguing right now, we review for clear error. You got to show that the findings made by this district judge were clearly erroneous. Can you do that? Well, yes, Your Honor, and I . . . Tell us how. Well, I . . . and I do want to add, before I say that, that to some extent, the extent the district court is misapplying the guidelines, is failing to undertake the appropriate guideline analysis, then it would fall into that part of the abuse of discretion aspect of it as well. The clear error is in . . . it is clear error to not sentence the defendant based on individualized facts and based on group facts. I think that that is fairly well established in this course. What was not individualized about the findings the district court made here? Well, the district court failed to make any findings at all with respect to three of the defendants, and one finding it did make with regard to the fourth defendant, but did not apply that finding, as to when they joined the conspiracy and what actions of the conspiracy from the time they joined it were reasonably foreseeable to them. And that was the very first step in the analysis for determining the relevant conduct. In order to get to roll, you have to at least start with relevant conduct, and by failing to take that step, it did with regard to one defendant, the one we're calling Aller Khan, because that's one of her last names. The district court did recognize that she clearly didn't join the conspiracy until May of 2012, but then the district court didn't, as to Ms. Aller Khan, go back and say, well, I have to then discount the fraud that occurred before May of 2012 at least in order to figure her loss amount. So that is, I mean, it's two levels of error as to the others because the court didn't even undertake the analysis that it did make as to Aller Khan. And as to Aller Khan, even though the court made the correct finding that she didn't join the conspiracy until May of 2012, the court didn't then back out the numbers. So we have these, again, grouped up numbers that just don't correlate with the reality of the participation of these individuals. And that affects both loss, particularly affects loss, because it's a numerical calculation that you can show clear error. Because what the district judge has to find in terms of role is some actual management of another person, some actual activity where you criminally are involved in managing another criminal participant. As to role, she did object, correct? We objected to both on both issues. On both the amount and the role for Aller Khan? Yes, for Aller Khan. Okay. What I was wondering is this business of the recruiters, the recruiters of the people with the beneficiary numbers, it seemed to me that that sounded like supervision. That wasn't supervision? There was no evidence of supervision really by anybody on the pharmacy side of the recruiters, but to the extent there was evidence of supervision of anybody on the pharmacy side, it was by the leader of this conspiracy, Daniel Suarez. The testimony with regard to it is so telling that the government cites it in the trans-sentencing transcripts. I think it's docket 401, page 15. The most damning testimony that the government had as to these defendants' participation in relation to this recruitment thing is that there was generalized testimony, there was testimony by an agent that someone had told him that they were present at least on some times when payments were made to a recruiter or to a beneficiary. But again, even in that, the best case, that's the best testimony the government has. That still doesn't get anywhere near the line for the management leadership role that is required under the guidelines. I thought there were facts in the pre-sentence report that they didn't object to that they paid recruiters. Each of these defendants didn't object to the fact in the pre-sentence report that they paid recruiters. My reading of the pre-sentence report was that they, it's consistent with the factual proffer, which was that they were responsible for the money that was used because they were the owners of the company. They owned the pharmacies. But there was no testimony to the effect, and there was objections to that to the extent, there was no testimony that they personally paid. That was the dispute. But the pharmacies that they owned paid. The pharmacies that they owned, and in another case, the government simply would have called these people nominees. That's not what I'm trying to get at. I'm just trying to understand the facts. These defendants owned different pharmacies, correct? Yes. Okay. And the pharmacies they owned paid the recruiters for the beneficiary information. I think that it's fair from the record to say that the pharmacies, the money derived from the pharmacies went to the recruiters, yes. Yes. Okay. And they owned the pharmacies. They were the owners of the pharmacies of record. But, again, this Court has never held that. They never worked at the pharmacies? They weren't present at the pharmacies? They were pharmacy technicians. They were pharmacy technicians. They filled prescriptions. They filled prescriptions. Okay. And they filled fake, well, they didn't even fill the prescriptions. They just sent in claims information. Like a prescription had been filled. They said it had been filled and got paid for, but it wasn't actually filled, right? I'm not sure if that was in every case, but I think there were actually some prescriptions. Well, some of them were filled. That's correct. But, yes, there's no question. But, again, all of those facts go to their individual culpability, that they did have a culpability. But in terms of the government's notion that because of. They have to supervise one person, right? They do. Just one? One is enough. One is enough. But there are none, and that's the problem. The payment, again, the Martinez case that we've cited goes over. I thought each defendant admitted they, let's get around payment. I thought they actually paid them, but I'll have to look at the record. I thought each defendant admitted they recruited recruiters to do this. No, no. Okay. So you're telling me if I go look at the record, they had no connection with any of these recruiters. They never saw them. They never communicated with them. No, there is testimony in the record that they were present, again, presumably when Daniel Suarez is dealing with one. When he's paying the recruiters. Either when he's paying the recruiters or when he's paying beneficiaries. There's presence. There is definitely evidence of presence. And they're owner of the company whose money Suarez is using to pay him. Yes, but this court has held that the money part of it doesn't make them managers. And that's what the Martinez case is very important for us in citing. I think you have to look at Sosa, too. Have you read Sosa? I wrote Sosa. Sosa's payment of recruiters, and we said it was enough. And Martinez is a drug case, isn't it? Sosa was my client. I remember. Okay. But Martinez is a drug case, right? It's a drug case. Yeah, Sosa is a Medicare fraud case like this case. Yes, and Sosa had actual appeal. One thing about presence with drug dealers is nothing about presence with Medicare fraud. When you own the pharmacy and your pharmacy is paying, and you're watching Mr. Suarez pay the recruiters, you know what's going on. I understand you, but there's a vast difference. I think Sosa is a very good boot camp. I hate to speak ill of a former client. Right. But he's actually involved. You're saying he was Mr. Suarez. He was Mr. Suarez, exactly. The money is just not enough, particularly, particularly. It's of heightened importance when you have a family circumstance because here you have clearly Suarez is getting the very vast bulk of the money. Clearly it's undisputed. He brings his mother and Angelina back from a ---- But each defendant here got at least $400,000 or $500,000. Right. Of course, we don't know exactly where that money goes after that, and that's really what the government's doing. Well, but we know they did this and got $21 million or something, and each of these defendants got millions. I mean, I actually think a couple of them got millions of dollars. I understand. Of Medicare prescription fillings for people that didn't exist and they didn't even fill the prescriptions, right? There is no question that their money, if the guidelines were based on the financial aspect, that I would not have an argument on that. I'd still have the great argument on the loss,  But all they have here is the money. They have the money and Mr. Daniel Suarez. Okay. You've saved time for rebuttal, Mr. Coon. For the United States, Ms. Reed. She says all you've got is money. What have you got besides money? The court based the role in the offense determination on three factors. The first is the factual proffer from each of these appellants, and in their factual proffers, each of them said, quote, I paid Medicare beneficiaries and used others to pay beneficiaries so that the beneficiaries' Medicare beneficiary numbers would serve as the basis of fraudulent claims. So they're all admitting that they paid these Medicare beneficiaries. Number two, as Agent Crespi, the case agent, testified, Daniel Suarez spoke to the agents post-arrest, and he explained how the conspiracy worked. He explained that they all equally managed the conspiracy. They paid their patient recruiters. Everybody was there at each pharmacy when these patient recruiters were paid, and these recruiters were paid for a couple of things. They were paid because they, in turn, recruited these complicit Medicare beneficiaries so they could use their numbers, and they would pay, in turn, the beneficiaries. And two, they were paid, the recruiters were paid, because they were getting prescriptions, false prescriptions from complicit pharmacists. So there was a whole chain of events that were put in place by each of these owners, according to Suarez. And remember, Daniel Suarez is the son of Alarcon and the nephew of two of the others. He was only 18 years old when this conspiracy began and was 23 by the time he pled guilty. He was able to explain to the agents involved exactly how this played out, exactly what they did. They took money from all of these pharmacies, and they put it into a company called Red and Blue Financial, a shell company, and from there they distributed money. They distributed money even from the pharmacies themselves. There are differences among the defendants. For example, there's testimony that a lady whose name begins with an E actually paid recruiters, but then there's testimony that Alarcon was there when somebody was paid. I mean, there are differences. I agree. And there's also a difference with people who came into the conspiracy later. I mean, they can't be liable for monies that were losses that occurred before they came into the conspiracy, right? That's correct, but then we have to go back to their own factual proffers again. Remember, each of them proffered that they were part of this conspiracy starting in September 2010. It was only when they came to the point of sentencing that they suddenly decided that no, no. Well, did the district judge make a finding that he believed their proffer and not something that happened at the hearing? Absolutely. That was the basis of the court's decision. There was no judge finding that they came into the conspiracy in 2010 and not 2012. I actually couldn't find a district judge making that. The way the court analyzed in terms of role in the offense or the amount of the loss? I think it goes to both, doesn't it? Well, role in the offense, I'm talking about the money now, the amount of money which has to do with how much you go up in the sentence and how much you have to pay in restitution. So I'm interested in both those two bases. The court looked at it in terms of their own factual proffers said that they owned and operated the pharmacies beginning in 2010. But the court said, I'm going to look at this conservatively for determining the amount of the loss and pointed out that there was testimony from the case agent that had reviewed all of the financials of these companies that the conspiracy really started ramping up in 2012, that at least two of the pharmacies that had generated the greatest amount of the loss were not even incorporated until 2012 and one in 2013. So the vast majority of the money, of the $21 million that was stolen from the government, happened starting in 2012. So does vast majority get you past $9.5 million? Not at all. But here's the way the court did it, a very conservative estimate, individualized for each of the particular defendants. First, the court looked at this. Which pharmacy did the particular person actually get money from and which pharmacy did they actually own on paper? So starting with Mrs. Gonzalez, she was the owner of Galaxy. The court went through this analysis. It's all in the sentencing transcript in DE-401. She owned Galaxy. The loss from Galaxy was $6 million roughly. The court then said, okay, we've traced the money that she got from Alpha and Red, and both of those pharmacies had a total of $2.3 million for Alpha and $2.7 million for Red. So the court then added $6 million from Galaxy, $2.3 from Alpha, and $2.7 from Red, and got $11 million. The court went through that analysis for each of the defendants. For Ms. Alarcon, she was the named owner and the admitted owner in her factual proffer of Red Pharmacy. The loss was $2.8 million. Galaxy and Alpha were two other companies that the forensic accounting actually traced that she had gotten money from those companies. Galaxy, again, $6 million loss. Alpha, $2.3 million loss. So from Alarcon, $11 million won for the loss for her. That's their role enhancement. But then what do we do about the restitution? Because we need to know that none of the $21 million happened before they got involved in the conspiracy. So we need a finding to uphold that. Don't we need a finding from the judge that whatever happened between 2010 and 2012, they're responsible for because somehow they were involved in the conspiracy? The court looked at the fact again. The court went back to the factual proffer from each of these defendants saying, I was involved in this conspiracy from 2010, as they all said in their proffer. Okay, so it's all based on the proffer. Then there's the PSI, and they object to the PSI and say, no, that's wrong, which means my proffer was wrong. But the district judge said, I believe the proffer? No. I didn't see that. Yeah, see, they never actually said that their proffer was wrong in terms of when the conspiracy began. And when they knew that they were conspirators. What they're saying in their role in the enhancement argument is, well, yes, we were conspirators from September 2010 to February 2015, as we said. But for role in the offense, we weren't really doing anything. We were living in Nebraska. We were not involved in making decisions. And this was a theory that they advanced for the first time. How are they involved in 2010? They're involved because, first of all, the pharmacies were instituted. According to Mr. Suarez, they were all working together. From 2010? From 2010 to 2015. They were all making decisions and paying patient recruitment. And they didn't own any? Did they own the pharmacies in 2010? That's a very good question. I think, as I said, most of the pharmacies were opened in 2012. So if we go back to the PSI, we can see that, individually, the only pharmacy that opened in 2011 was Galaxy. But a few months later, in early 2012, Mrs. Gonzalez became the owner. So, as I said, much of the activity is occurring in 2012. If nobody owns any pharmacies until 2011, we're not really concerned about the loss amount for 2010, right? Simply because there really wasn't much loss in 2012. Can there be any loss if nobody owns a pharmacy? If nobody in this particular... First of all, there's only two defendants that were out of town, or they're making the argument that they were not there at that point in time. Could they be involved in the amount of the loss if the pharmacies were not actually operating in 2012? I'm trying to figure out if there's a problem with the loss amount, the whole $21 million. For restitution purposes. Nobody owns a pharmacy yet in 2010. Then how's the scheme going to work? I'm looking at the PSI to determine when the pharmacies actually opened. Even though the conspiracy began in 2010, I'm not sure that any loss has occurred until the actual claims were filed and paid, which would be 2011. I believe that is why the 2010 figure is when the company is ramping up. But you don't actually have a loss until the money is actually paid. But I can review the record carefully and respond to that. If you would like me to send a letter, I can certainly do that. I'll leave it to the presiding judge here. We'll let you know if we need something. Okay. If we confer. All right. With respect to the amount of the loss, when we look at what the court is saying, I'm sorry, but the managerial role in the offense, when we look at what the court is saying on DE-401, page 87, the court found that the individuals that were directed were the patient recruiters. The court says, they held themselves out as owners and operators in pharmacies, paid and directed recruiters, and paid Medicare beneficiaries. Apart from the interaction between the family members, I think this merits the three-level enhancement. So that's who the court found specifically, and that would be in line with this court's finding in SOSA. The recruiters were paid and directed by each of these owners. With respect to the amount of the loss, as the court determined, the conspiracy began in 2010 based on Mr. Suarez's own admissions and the appellant's own admissions in their factual proffer, and that supports the restitution argument as well. Have I got this right? Mr. Suarez came here in 2009 and then started this conspiracy in 2010 with one of the? With an aunt. With one of these defendants or somebody else? With one of these defendants. Which one did he start it with? It would be Borrego. The last name is Borrego. Borrego. I believe it's Odalis. He's only seventeen when he comes here, and he starts this . . . he comes here from Cuba, and he starts this with his aunt. When he's eighteen years old. When he's eighteen. And then that's 2010. So is she involved from 2010 on? Absolutely. She's definitely involved. Her name is on the first of the pharmacies to be incorporated. Okay. And then who joins next? He's the son of somebody. He's the son of Alarcon? Alarcon. And she's in Nebraska, and then she moves here and starts the conspiracy or what? Well, I do want to point out, and I'm sure Your Honor understands, a person doesn't have to be in Florida to be part of a conspiracy. I understand that. But we can determine only from her own admission as to when she moved here because none of that employment in Nebraska had been verified. That was only their statements to the probation office. And as you can see when you read the PSI, that information was not verified by their purported employers in Nebraska. Okay. So what does her proffer say? She just says she joined the conspiracy in 2010. Every single one of these ladies proffered that they joined a conspiracy in September 2010 until, I believe, February 2010. Okay. And none of them testified at the sentencing hearing? None of them testified. None of them have given the government any information. The only person that testified at the hearing was this Agent Crespi? That's correct. Agent Crespi who had debriefed Daniel Suarez and some of the patient recruiters and a cooperating pharmacist. Okay. And he testified how the overall conspiracy worked. That's correct. Did Suarez testify at his own sentencing hearing? I get the idea that the district judge is basing a lot of what he did on something that happened at the Suarez sentencing. I don't believe that Suarez testified at his own sentencing. Again, it was Agent Crespi. Okay. So it was Agent Crespi in both cases? Yes. And the testimony is all Crespi in this case. The district judge is not relying on Crespi in the other case? I was a little confused by all these . . . The district judge says, I heard the Suarez sentencing. I'm sticking to my views on that. But there's no incorporation into this case. I'm just not sure what to do with the Suarez sentencing is what I'm asking you. What do I do with that? What bearing does it have? I think it's referred to a couple of times. The court talks about the Suarez sentencing when he makes a decision on the sophisticated means enhancement. He said, I'm not going to include that enhancement because I didn't do it for Mr. Suarez. I believe that all of these Medicare fraud . . . that this Medicare fraud is no more sophisticated than the regular, no more sophisticated than any of the other Medicare frauds that we've dealt with. So that's the one reference. The other reference to Suarez is that I gave him 109 months as a sentence, and I believe that because the information we have is that everyone had the same amount of authority and the same amount of ownership in this conspiracy, I'm going to give these particular conspirators the same sentence. So those two references. Does that answer your question? I think it comes down to this, and as Judge Dubina aptly pointed out, these appellants cannot show on this record any clear error in the court's reliance upon their own factual proffers, on their own co-conspirator's post-arrest statement, and upon the statements that Agent Crespi had received from the cooperating patient recruiters and the pharmacist. And the forensic analysis of the 60 bank accounts involved in this offense speak for themselves. Money went from these conspirators' personal bank accounts. Money was received from the conspiracy into these personal bank accounts of these particular people involved. Before you sit down, let me ask you one question about the reasonableness of the sentence. Each of these defendants argued that the fact that the district judge gave each one of them identical sentences is unreasonable. Tell us why it's not unreasonable under the facts of this case for each defendant to get an identical sentence. It's not unreasonable for this reason. First of all, their factual proffers, as to the extent of their involvement with absolutely identical word for word, each one in their factual proffers said, I was involved in the conspiracy from September 20, 2010 to February 2015. I paid and I caused to be paid these patient recruiters. I owned and operated these pharmacies. And then Daniel Suarez, their own co-conspirator, said, we worked as a family. Each of us did the same. Each of us was involved. Each of us made the decisions. And we ran this as a family. We'd ask that this court affirm. And they got the same sentence as Mr. Suarez, too? I mean, he got nine. 109 months, yes. Sure, go ahead. Do you think they all preserved their arguments as to role and restitution and the level of loss? Or is there anybody who waived it? I think Atari certainly waived that argument in terms of the amount of the loss and the restitution. The others did preserve. Okay. Thank you. All right. And I think you wanted her to file a letter brief on something. I don't. You don't? Okay. Because I'll have her do it if you want it. Okay. At this moment, I don't. All right. So if we want something, we'll send you a letter from the clerk's office. That will be fine. What we want. Thank you, Your Honor. Thank you. Mr. Kluge, you reserved your full five. Thank you, Your Honor. Help us with the proffer. And it may well be your argument just is you don't dispute the proffer. The district court could use the proffer, do you? No, I dispute the interpretation of the proffer. Okay. But you don't dispute that those are admitted facts, that the district court doesn't have to make fact findings of those things in the factual proffer? When the government presents contrary evidence at the sentencing, at a minimum, yes, the district does have to make findings. The government chose to put on evidence at the sentencing. It was the government's evidence that contradicted the proffer. So at that point, sure, a proffer, it just becomes, if it were to be given. I've just read the district court fact findings, and he made, or she, I don't know. Middlebrook. Middlebrook. So he made fact findings that the defendants paid recruiters. I thought your argument was you'll accept the fact findings that he made at page 87. I was just rereading them. He makes fact findings, they own the pharmacies, they paid the recruiters. Right. And he kind of uses the payment of the recruiters, and I thought your argument was, well, payment of recruiters is not enough to show role. It certainly is not. But he makes some fact findings right here, right? Well, it depends. Again, if I pay an investigator, you know, I could say, yeah, I paid the investigator, and it turns out, no, it was actually an associate in my office who paid the investigator. Everybody says, well, that's perfectly normal to say that, you know, that my company paid somebody. And so in some sense. He doesn't say the company. I understand that. He says they held themselves out as owners and operators of pharmacies, paid and directed recruiters. I'm reading from his fact findings. They, the defendants, paid and directed recruiters and paid Medicare beneficiaries because they paid people in addition to the recruiters to recruit the Medicare beneficiaries, apart from the interaction between the family members, you know. It's an absolutely unfounded statement for the district court to have made that they directed recruiters. Paid and directed recruiters. There's absolutely zero evidence that you could make even a conclusory finding that they directed recruiters. The paid recruiters, as the testimony shows in the record, and I understand Judge Rastani's point regarding page 15 of the transcript,  and say that she actually paid while the other three were just present. But my reading of the transcript is that he's really clarifying on page 15. He's really clarifying that even Achari, all he knows is she was present. He's really clarifying that that's what he means by paid. That's what he means by she paid. But, again, I can understand that that's a, it's easy to dispute that. The court talks about 3B1.1 regarding role and being a manager or supervisor but not an organizer. And he goes on and says, the comment says I should consider recruitment of accomplices. Does that comment say that? The recruitment of accomplices is something you can look into as to role? Yes. Is that a proper factor for role? It's definitely a factor, again, in the sense of recruitment, bringing somebody into a conspiracy. If you've got a conspiracy going and you reach out to somebody and put somebody in the criminal conspiracy. And in-paying recruiters doing that? No, again, not. Again, this is an operation that certainly for the majority of these people is ongoing for two years. The clients, certainly for Alacon and Gonzalez, they're all working in Nebraska for Omaha Steaks or something. I don't know where they're working. It's a meatpacking plant over there. And Daniel Suarez, who's the big money person in this thing, says come on down and I'll make you money here. There's no reason for you to be slaving like that. Come be the owner of these companies and you'll make money. I mean that's what happened. It's just unquestionable. That's what happened. And so when these terms are made of from in or around 2010 to in and around 2015 I conspired, that doesn't mean that they're admitting I joined the conspiracy in 2010. That would be perjury. I mean it would be perjury and it would be government-induced perjury because it's simply not true. It's no evidence of it and it's refuted by all the facts. He actually goes back and said, he distinguishes Dominguez, that case. He said in that case there was no evidence that the particular defendants paid recruiters. And he says, or the kickbacks or so forth, and he distinguishes that and says here, they agreed in the proffer that they paid Medicare beneficiaries who, of course, would be participants in the criminal activity. They also paid others, the recruiters. This is another fact-finding, who would also be direct participants. Okay, so you're just saying there's no evidence they paid them because. . . There's no evidence that that. . . Even though they admitted in the factual proffer. When you have a term, a concept that can be read many different ways, and then you have evidence presented at sentencing that explains it, you should rely on the evidence at sentencing. That's all I'm saying. And the evidence was presented by their witness. So it's not like I'm making it up. Their witness, did you have any evidence whatsoever, any evidence, that before she came back from Nebraska in May of 2012 she was involved in any way in this case? Answer by agent, no. What about Ms. Gonzalez? The same, no. Do you have any forensic evidence? They talked forensics. Let's look at the forensics. Where does it start? 2012. And again, you're talking, they're attributed the full value of an organ. . . They talk about ramping up. There's some of these entities that can make millions of dollars where they're getting $3,000, $3,000 from an entity, and yet they're being given the whole entity. The case should be remanded with specific directions. . . Well, Gonzalez received $910,000. They all received over hundreds of thousands of dollars, and the loss amount was they all knew what was going on in the pharmacies. It was all one family affair. And he gave them the loss amount of the whole amount. And that's why they pled guilty, Your Honor. All I'm saying is when you've got a highly technical, mechanical apparatus like the guidelines, it has to be operated correctly when you're doing the mechanical part of it. And that's all this is. This is just a mechanical operation question. When did they start? Your time has expired, and I've let you go over two minutes. So I think we understand your point that there weren't sufficient evidence and fact findings. So we'll have to review the record in detail. The next case in the morning . . .